UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:11-CV-552

NATHANIEL STANLEY                                                               PLAINTIFF,

v.

CENTRAL KENTUCKY COMMUNITY
ACTION COUNCIL, INC.                                                           DEFENDANT.

## MEMORANDUM OPINION

This matter is before the Court upon Defendant's Motion for Summary Judgment. (DN 13.) Plaintiff has responded, (DN 14), and the Defendant has replied. (DN 18.) Also before the Court is Plaintiff's Motion to Deny Defendant's Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 37. (DN 15.) Defendant has responded, (DN 19), and the deadline by which to reply has passed. These matters are now ripe for adjudication. For the following reasons, Plaintiff's Motion, (DN 15), is DENIED and Defendant's Motion, (DN 13), is GRANTED.

### BACKGROUND

Plaintiff, Nathaniel Stanley ("Plaintiff" or "Stanley"), is an African American male who worked as an employment specialist for Defendant, the Central Kentucky Community Action Council, Inc. ("Defendant" or "CAC"), from March 2008 until his termination in July 2010. (Stanley Dep. 18:12, Sept. 10, 2012, DN 14-1.) Kentucky Works Coordinator, Tracy Dennison, interviewed Stanley for the position and became his immediate supervisor. (*Id.* at 18:20-20:3.) During the course of his employment at the CAC, Stanley experienced a number of problems with Dennison. At some point in 2008, Stanley noticed Dennison would make remarks "about

her husband and men in general." (*Id.* at 23:1.) Stanley could not remember any specific comments, but does remember that he took the comments to be demeaning, although he admits the comments were never about him. (*Id.* 22:19-23:5.) Stanley also found Dennison to be abrasive and disrespectful in her interactions with him. (*Id.* at 24:23-26:5.)

Stanley levied his first documented complaint about Dennison in late February 2009. Following an email exchange about the proper procedure for submitting certain information to Dennison, Stanley sent a lengthy email to Dennison on which he copied CAC Human Resource Director Denise Fogle. (Defs.' Ex. 2, DN 13-3.) In part, the letter told Dennison: "you are rude, abrasive, talk down to your subordinates; patronize your subordinates; and make off-the-wall and untrue statements and accusations to your subordinates about following directions, work attitudes, performance and following instructions." (*Id.*) Stanley further noted that he felt like he was being singled out because Dennison had said nothing to the other employment specialists and said that Dennison was "com[ing] across like a supervisor that [sic] is trying to build a case or initiate a paper trail for disciplinary actions, when it is not warranted." (*Id.*)

After a period without documented problems, on July 31, 2009, Dennison issued a written reprimand to Stanley for his behavior at a personnel meeting. (Defs.' Ex. 3, DN 13-4.) Dennison's reprimand also advised Stanley to discontinue including negative remarks in case tracking comments. (*Id.*) Stanley was not demoted or otherwise disciplined as a result of the written reprimand, though he was advised that continuing such behavior would result in his immediate dismissal. (*Id.*) A few days following the reprimand, Stanley sent Fogle an email on August 5, 2009, indicating that he continued to have problems with Dennison. (Defs.' Ex. 6, DN 13-7.) Specifically, Stanley reiterated his complaints that Dennison was abrasive and demeaning and inappropriately scrutinized Stanley's work. Stanley told Fogle that he was "the first and only

[Kentucky Works Program] Worker that [Dennison] has ever harassed, scrutinized, and called clients behind my back in an effort to find something wrong." (*Id.*) Fogle shared Stanley's complaints with Community Services Director, Lynne Robey, and CAC Executive Director, Thomas Moorman. (*See* Robey Aff. Attach. 1, 2, DN 13-8; Moorman Dep. 25:8-10, Aug. 9, 2012, DN 13-10.) In response, Moorman attempted to set up a meeting addressing Stanley's concerns. (Defs.' Ex. 8, DN 13-9 (handwritten note from Moorman suggesting August 17, 18, or 19 as possible dates and telling Stanley to contact him "at any time" on his cell phone).) Though the parties "went back and forth" about possible dates to discuss Stanley's complaints, the meeting ultimately never occurred. (Stanley Dep. at 64:23-65:14.)

From late September 2009 through mid-February 2010, Stanley continued to draft complaints to Fogle.[1] In a communication hand-dated September 20, 2009, Stanley described a staff meeting that covering topics ranging from computer usage, time off policies, the expectation that workers not remain in the office after hours, and safety issues. (Defs.' Ex. 11, DN 13-12.) Stanley complained that the staff was already aware of most of the information covered during the meeting, and he and fellow co-workers "believed that most of the topics that were discussed by [Dennison] were aimed at me." (*Id.*) Stanley also noticed various vehicles in the parking lot when he would leave work for the day, which he contended were individuals "spot checking" him on behalf of Dennison. (*Id.*) The email also noted that the previous Friday, September 18, 2009, Dennison had asked him to rearrange his office, and as a result, he was unable to get his work done. (*Id.*) Stanley complained that although Dennison had told him all of the offices would be rearranged to enable staff to exit in an emergency, his was the only office that had been rearranged as of his September 20 communication. (*Id.*)

---

[1] Several documents produced by Plaintiff are emails that lack a time stamp and instead bear a handwritten notation of the date. It is unclear, therefore, whether these emails were sent to Fogle or are merely draft emails.

A November 6, 2009, communication again referenced his suspicion he was being watched as he departed from the office. (Defs.' Ex. 12, DN 13-13.) Stanley also recounted incidents where Dennison: questioned whether Stanley had come to work on a day during which he had not returned her phone message and arrived late the following morning;[2] addressed him in "a very loud mean voice" while discussing making copies of office keys; questioned his and co-worker Jane Lee's handling of a Wage Subsidy Termination; and made him turn his radio volume down to personal listening level, despite office practice of leaving it loud enough for the entire office to hear. (*Id.*) After describing these events, Stanley noted that "Tracy does not even seem to have any respect for any 'employees of color'" and displayed a "total disregard for minority staff members that are in positions of authority." He also told Fogle that he was tired of the constant harassment. (*Id.*)

Finally, in a February 13, 2010, communication, Stanley informed Fogle that Dennison continued "knit-picking" his work, spoke to his assistant rather than directly to him about critical information, asked fellow employee Cindy Milby to report whether Stanley and his co-workers were working the required number of hours, and gave him, but not other employment specialists, an annual evaluation. (Defs.' Ex. 13, DN 13-14.) Stanley contended that "[i]f [Dennison] is making an attempt to evaluate her personnel, she needs to . . . hold all seven employment specialist [sic] accountable for this, and not just the 'lone black male employee' that she obviously has disdain for." (*Id.*)

Although his February 13, 2010, is Stanley's last written complaint, Stanley met with Dennison, Moorman, Robey, and Fogle on April 16, 2010, following his failure to immediately report a client's threat on a case manager's life. (Stanley Dep. 133:13-135:3.) During the meeting, Plaintiff was informed that his delay was a serious lapse in judgment and grounds for

---

[2] In the communication, Stanley indicates he arrived late due to a flat tire.

4

termination, but because there was no set reporting procedure, he received only a verbal reprimand. (*Id.*) A few days following this meeting, Dennison and Stanley exchanged a series of emails concerning proper procedures for requesting and recording personal leave. (Defs.' Ex. 19, DN 13-20.)

On May 5, 2010, Stanley filed his first EEOC charge, alleging that he was subjected to different terms and conditions of employment, disciplined, denied promotion, and retaliated against because of his sex and his complaints of sex discrimination. (May 5, 2010, EEOC Charge of Discrimination, DN 14-4.) After learning of Stanley's complaint, Moorman ordered an investigation: "[t]o see if there was any truth to it, if there was anything to it, I wanted to know. He was the only man working in that program at the time." (Moorman Dep. 31:19-21.) Thereafter, Robey met with Stanley; Dennison; Milby; Cheryl Freeman; and Freeman's assistant, Sharon Perry about "the friction in the Hardin County Office." (Robey Aff. Attach. 1, 6.)

Just over two months later, Stanley's co-worker, Cindy Milby, informed Dennison that Stanley had been making "vulgar" statements about Dennison at work. (Dennison Dep. 18:1-8, DN 14-3.) Because the allegations concerned comments about her, Dennison directed Milby to speak with Robey. (*Id.* 26:16-22.) Robey asked Milby to put her allegations in writing. (Robey Aff., Attach. 1, 7.) Milby's written statement alleged that Stanley made a variety of vulgar statements about Dennison, and indicated that Cheryl Freeman also had overheard his comments.[3] (Milby Statement, Defs.' Ex. 26, DN 13-27.) On July 23, 2010, Milby's statement

---

[3] Specifically, Milby alleged Stanley made the following statements in her presence: "I wish her husband would give her some so she would get off my F---ing ass"; "All she needs is her guts pocked [sic] real good"; "She could craw [sic] up under my desk and I could shut her up"; "I bet she acts like the man instead of her husband"; "I can give her 13 inches & shut her F---ing mouth"; and "That Bitch [sic] doesn't know who she is F---ing with & she is going to cost this Company a lot of money. I'm not F---ing scared of her[;] hell I have been in two F---ing wars. Hell I'm an old man[;] they can just pay me and I'll go sit home for all her stupid shit." Stanley denies making these statements and attributes many of them to Milby herself. (Stanley Dep. 158:17-162:3.)

5

was incorporated into a sworn affidavit. (Defs.' Ex. 27, DN 13-28.) Robey presented the affidavit to Executive Director Moorman and the two discussed its implications. (Moorman Dep. 33:16-21.) On July 23, 2010, Moorman drafted a termination letter that was not executed or provided to Stanley. (Pls.' Ex. 9, DN 14-10.) On July 27, 2010, Moorman, Fogle, Robey and Robey's assistant, Ellen Leake, interviewed Cheryl Freeman. Although Freeman had not overheard the more colorful comments, she confirmed that, like many in the office, Stanley had called Dennison a "bitch." (Freeman Dep. Aug. 9, 2012, 14:13-17, DN 14-13.) She also confirmed overhearing Stanley comment that Dennison likely was the man of the house and that "if she'd get her some, she'd calm down." (*Id.*; Freeman Sworn Statement, July 17, 2011, 27:11-12, DN 13-29.) Based on this confirmation, Moorman drafted a modified termination letter on July 27, 2010. ((Pls.' Ex. 10, DN 14-10.) Stanley was terminated on July 29, 2010.

On January 21, 2011, Stanley filed a second complaint with the EEOC alleging discharge in retaliation for his discrimination complaints and prior charge with the EEOC. On July 7, 2011, the EEOC dismissed Stanley's charges and issued him a right to sue letter. This suit followed on October 4, 2011. Defendant now moves for summary judgment on all counts.

## STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether

the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012).

## DISCUSSION[4]

### I.   Plaintiff's Motion for Sanctions

As an initial matter, Stanley has filed a motion requesting this Court to deny Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 37(c)(1). As grounds, Stanley contends that Defendant did not produce two documents that should have been produced during the discovery stage of litigation. Specifically, Stanley notes he did not receive a copy of (1) a summary prepared by CAC Community Services Director Lynn Robey in response to the EEOC investigator's request for additional information ("Robey Summary") and (2) a sworn statement obtained by Defendant's counsel from Cheryl Freeman dated July 27, 2011. Because Defendant refers to both these documents in support of its motion, Stanley moves this Court to deny the

---

[4] Defendant has moved for summary judgment on all of Stanley's claims, including violations of 42 U.S.C. § 1981 and the Equal Protection and Due Process provisions of the Fourteenth Amendment, which are mentioned in Stanley's complaint as possible grounds for relief. Because Stanley's response does not address these claims, it appears Stanley has abandoned them. Therefore, the Court will grant summary judgment on them without further discussion.

motion in total. Defendant admits these documents would have been responsive, but notes counsel was unaware that the documents had not previously been provided to Plaintiff's counsel.

Rule 37(c)(1) of the Federal Rules of Civil Procedure provides from sanctions when a party fails to comply with the requirements of Rule 26. Fed. R. Civ. P. 37(c)(1). Federal Rule of Civil Procedure 37(c) provides as follows:

> (1) If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
> 
>    (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; . . . and
>    (C) may impose other appropriate sanctions. . .

*See also Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003). Here, the CAC notes that discovery responses were prepared by former counsel for Defendant, and current counsel believed all pertinent documents had been disclosed. The CAC further notes that Stanley made no serious attempt to acquire the documents, through informal means or a motion to compel, before or after Defendant filed its motion for summary judgment. Finally, Stanley had the opportunity to depose Cheryl Freeman and Lynne Robey was identified as a fact witness in Defendant's Rule 26 disclosures. Because the Court finds the failure to disclose was both substantially justified and harmless, it declines to issue sanctions and will consider all the evidence put forth by both parties.

## II. **Reverse Discrimination / Hostile Work Environment**

Stanley alleges that "Defendant repeatedly and continually harassed, insulted, increasing surveilled, [sic] discriminated against, wrongfully disciplined, critically scrutinized Plaintiff's work, and provided false information about Plaintiff" in violation of both Title VII of the Civil Rights Act of 1964 ("Title VII") (42 U.S.C. § 2000e *et seq.*) and the Kentucky Civil Rights Act

("KCRA") (K.R.S. § 344.010 *et seq.*) (Pl.'s Compl. ¶ 12.) Because "the general purpose of the [KCRA] is to provide a means for implementing within the state the policies embodied in Title VII," federal courts may look to federal law under Title VII in construing the KCRA. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 403 n.5 (6th Cir. 1997).

To establish a prima facie case of sex discrimination under Title VII, a plaintiff must show (1) he is a member of a protected class; (2) he was qualified for the job; (3) he experienced an adverse employment action; and (4) he was replaced by someone outside of the protected class or persons outside the protected class were treated more favorably. *E.g.*, *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 568 (6th Cir. 2009); *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008). However, because Stanley is male, the first and fourth prongs are modified under the so-called "reverse-sex discrimination" scheme. To satisfy the modified first prong, Stanley must "demonstrate background circumstances to support the suspicion" that the CAC "is that unusual employer who discriminates against the majority." *Simpson*, 359 F. App'x at 569 (alteration omitted) (quoting *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003)). And to satisfy the modified fourth prong, Stanley must show that the CAC "treated differently employees who were similarly situated but were not members of the protected class." *Id.* (quoting *Sutherland*, 344 F.3d at 614).

Assuming for a moment that Stanley has shown the CAC is the "unusual employer" who discriminates against men, he has not shown that the CAC treated similarly situated female employees differently from him. First, the majority of Stanley's complaints to management show he believed he was in the same boat as his female cohorts: he first complained that Dennison talked down to and patronized her "subordinates" and, later, that she lacked respect for him and his fellow "employees of color," who were all women. Stanley's complaint alleges he was

scrutinized and questioned more closely than his female cohorts. To the extent Stanley points to differential treatment from his fellow coworkers, he fails to offer any evidence such treatment was based on his gender. For example, Stanley notes Dennison's scrutiny of the manner in which he submitted a request for time off. However, the record shows Dennison had similar exchanges with female employees about leave requests. (*See* Defs.' Ex. 20, DN 13-21 (email exchange with Cindy Milby regarding proper leave request procedures).) In his response, Stanley says "the issue regarding yearly evaluations, coupled with Stanley being the only male, is most telling." However, "[d]ifferent treatment does not constitute disparate treatment absent evidence of a disparate comparison to a similarly situated coworker or evidence supporting an allegation of illegitimate reasons for the employer's actions." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 69 (6th Cir. 1985). The same is true regarding Stanley's termination. Although the record shows that others in the office may have called Dennison a "bitch," Stanley has pointed to no similarly situated female employee who had remotely similar allegations of levied at her and was not terminated. Furthermore, even if this Court finds Stanley has met his prima facie burden, as described in more detail in Section III, *infra*, the CAC has offered a legitimate non-discriminatory for his termination and Stanley has not shown pretext.

Stanley's complaint also references he was subjected to a hostile work environment in violation of Title VII. Though his response does not address this issue in detail, the Court will briefly address the issue. To make out a prima facie case of sex discrimination based on allegations of a hostile work environment, a plaintiff must show that (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) the harassment was based on his sex; (4) the harassment created a hostile work environment; and (5) the employer failed to take reasonable care to prevent and correct any harassing behavior. *Vickers v. Fairfield Med.*

10

*Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006). A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To be sufficiently "severe or pervasive," (1) the conduct must be enough to create an environment that a reasonable person would find hostile or abusive, and (2) a plaintiff must subjectively regard the environment as abusive. *Id.* Courts look to the following factors to determine whether an objectively hostile work environment exists: the frequency of the discriminatory conduct; its severity; whether it is physically threatening, humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 678-79 (6th Cir. 2000) (citing *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 789-90 (6th Cir. 2000)).

As discussed above, Stanley has not shown Dennison's abrasive treatment toward him was motivated by his gender, as his female coworkers were also treated poorly. Furthermore, the facts outlined above, even when taken in the light most favorable to Stanley, simply do not show an objectively hostile work environment based on his gender.

### III. Retaliation

To establish a claim for retaliation, Stanley must show that (1) he engaged in activity protected by Title VII or the KCRA; (2) this exercise of protected rights was known to Defendant; (3) Defendant thereafter took a materially adverse employment action against Stanley, or he was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000) (citations

omitted). To establish a causal connection, a plaintiff must "proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009).

Stanley argues that "the temporal proximity between Defendant's knowledge of Stanley's EEOC complaint and the adverse action was sufficient to establish a *prima facie* case for retaliation." (Pl.'s Resp., 7, DN 14.) Under Sixth Circuit precedent, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). However, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* The Sixth Circuit has explained the reason for this distinction: "if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation." *Id.* (*citing Cardenas v. Massey*, 269 F.3d 251, 264 (3d. Cir. 2001) ("[T]emporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not unusually suggestive.")).

The Court does not believe temporal proximity alone is significant enough here to establish a causal connection between his termination and his EEOC Complaint. Stanley's termination occurred on July 29, 2010, nearly three months following his May 5, 2010, EEOC complaint. Given the context of this case, the Court does not believe this is the type of immediate

12

retaliation contemplated under Sixth Circuit precedent. Furthermore, Stanley has proffered no evidence that suggests his protected activity was likely the reason for his termination.

Were the Court to find Stanley met his prima facie burden, the CAC has offered a legitimate, nondiscriminatory reason for his termination—a coworker's accusations of inappropriate and sexually-suggestive comments about his supervisor—and Stanley has not shown pretext. In order to establish pretext "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994) (citing *Gaworski v. ITT Commercial Fin. Corp.*, 17 F.3d 1104, 1109 (8th Cir. 1994)), overruled on other grounds by *Geiger v. Tower Auto.*, 579 F .3d 614 (6th Cir. 2009). The plaintiff must show "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the action], or (3) that they were insufficient to motivate [the action]" in order to establish pretext. *Id.* at 1084 (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)).

Stanley argues that there is a jury issue because he denies the allegations levied at him by Milby and that Freeman did not hear many of the comments Milby attributes to him. However: "the plaintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). To determine whether such an "honest belief" existed, a court "looks to whether the employer can establish its 'reasonable reliance' on the particularized facts that were before it at the time the decision was made." *Id.* (citing *Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998). This does not require that the employer's decisional process be "optimal" or leave "no stone unturned." *Id.* Rather, the Court must determine whether

13

the CAC "made a reasonably informed and considered decision" before deciding to terminate Stanley's employment. The Court finds the CAC did so here. Upon learning of Milby's allegations, Robey requested a signed, written statement and, ultimately, an affidavit to verify their truthfulness. Moorman and Robey interviewed Cheryl Freeman, who confirmed enough details that Moorman was satisfied Milby's complaints were legitimate. The role of the Court is not to evaluate the employer's business judgment, but instead to determine whether the employer was motivated by retaliation. *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987). The Court finds that the CAC was not. Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

## CONCLUSION

Defendant has moved for summary judgment on Plaintiff's claims. For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. An appropriate order shall issue.

Date:

CC: Counsel